UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **18CR00675** |
| v. | ) | Honorable Elaine Bucklo |
| | ) | |
| CHRISTOPHER COLON, | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Christopher Colon, Defendant, by his attorney Thomas Brandstrader , submits this Sentencing Memorandum pursuant to 18 U.S.C. § 3553, and Local Criminal Rule 32.1(g), in advance of his sentencing hearing, which is currently set for June 5, 2020.  It is respectfully requested that Mr. Colon receive the mandatory minimum sentence of 15 years.

### I. Introduction

Christopher Colon is a 39-year-old man with a criminal history score of III who plead guilty to one count of receipt of  child pornography.  He has been evaluated by Dr. Mark Brenzinger and found to be Moderate-High Risk Potential for sexually victimizing others in the community. Colon has been in custody since his arrest on October 26, 2018. Colon has accepted responsibility for his crimes and is remorseful, ashamed, and wants to obtain treatment.  He and his family are devastated by his conduct but he recognizes that it is he who put himself in this situation.

On October 26, 2018, the F.B.I. executed an arrest warrant at his residence in Oregon following the filing of the instant indictment. On September 20, 2019, Colon plead guilty pursuant to a written plea agreement to Count 1, receipt of child pornograph.

On November 25, 2019, the United States Probation Department prepared a Presentence Report ("PSR"). The PSR calculated a total offense level of 21. (PSR $21)

The PSR placed Mr. Colon in Criminal History Category III, as he was on probation in State court for a similar offense. (PSR $56) Based on those calculations, the guideline imprisonment range is 46 months to 57 months. (PSR 139) However, as there is a 15 year mandatory minimum (due to prior offense) the guideline term of imprisonment is 180 months. USSF $5G1.1 (b). (PSR $140) Probation filed a sentencing recommendation of 180 moths. 30 years. *See Probation Recommend.*, p3.

Prior to Probation's report, the government filed its version of the offense. *See Government Version of Offense* ("Govt. Version"). Their calculations were similar to the Probation calculations but somehow came to a level 23, instead of the correct level 21. The Government also found a criminal history of III and noted the mandatory minimum of 15 years. *See Govt Version, p*. 13.

## II. SENTENCING POSITION

As first stated in *United States v. Booker*, 543 U.S. 220, 245 (2005), and further clarified in *Gall v. United States*, 552 U.S. 38 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007), the Sentencing Guidelines are merely advisory and are not the court's only consideration in sentencing. Instead, the court must consider all the purposes of sentencing under 18 U.S.C. § 3553 and the Guidelines calculation is just one of seven factors specified in 18 U.S.C. § 3553(a) that a sentencing court must consider.

The factors listed in § 3553 include: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the kinds of sentences and the sentencing range established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing Commission; (5) the need to provide restitution to any victims of the offense; and (6) the need to avoid unwarranted sentence disparities among similarly situated defendants. *See* 18 U.S.C. § 3553(a)(1) and (a)(3)-(7).

After considering all of these factors, the sentencing court must impose a sentence "sufficient, but not greater than necessary" to achieve the following four purposes set forth in the Act:

> (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (2) to afford adequate deterrence to criminal conduct;
> (3) to protect the public from further crimes of the defendant; and

(4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]18 U.S.C. § 3553(a) and (a)(2).

**A.** There are no specific factual objections to the PSR or sentence recommendation by the Probation report

**B.** There are no specific objections to the Guideline Calculations in the PSR.

**C.** On November 25, 2019, the United States Probation Department prepared a Presentence Report ("PSR"). The PSR calculated a total offense level of 21. (PSR $21)

The PSR placed Mr. Colon in Criminal History Category III, as he was on probation in State court for a similar offense. (PSR $56) Based on those calculations, the guideline imprisonment range is 46 months to 57 months. (PSR 139) However, as there is a 15 year mandatory minimum (due to prior offense) the guideline term of imprisonment is 180 months. USSF $5G1.1 (b). (PSR $140)

The mandatory minimum sentence is draconian when compared to the facts of the case, i.e, there was no physical contact with any minor, there was no physical injury to any known party, and, it was words alone at issue.

As far back as 2011, the Sentencing Commission found in a preliminary stude that the mandatory minimum penalties for certain child pornography

offenses and the resulting guidelines sentences may be excessively severe and as a result are benign applied inconsistently. 2011 Mandatory Minimum Report, at 365.

Move to 2017 and further study by the Commission specifically focused on on the mandatory minimum penalties for receipt of child pornography found the problem of unwarranted disparities from inconsistent application of the mandatory minimum penalty for receipt offenses went unabated and urged Congress to align the disparities.Mandatory Minimum Penalties for Federal Sex Offenders, USSC 2019 p 56

D.      Christopher Colon is a 39-year-old high school graduate who is not married and has no children. Mr. Colon has never been sent to prison and thus the impact on him will be different than to others. Further, the Seventh Circuit has noted that the older a defendant becomes, the less likely the chance of recidivism. United States v Presley, 790 F3d. 699, 702 (7th Cir. 2015)

E.      Mr. Colon developed a seizure disorder in 2012 which resulted in the discovery of a right temporal lobe tumor and surgery followed. The medical report issued after that surgery indicated that a residual tumor is not entirely excluded and he continues on daily medication which must be closely monitored as he is subject to epiletic seizure. (PSR $82)  (see attached Drs. Letters post surgery)

F.    Mr. Colon has worked throughout his adult life.  (PSR $121 - 131

G.    Colon  has no history of violence. (PSR $55)

H.    As noted in the PSR, Colon is a victim of sexual abuse himself.
(PSR $85)

The Court is likely aware of the cycle of abuse often present in these cases.  Here, Colon's own abuse is not offered to excuse any behavior but to provide some fuller context.  It is also an issue that Christopher recognizes now and something that he wishes to address in treatment.

I.  Sexual evaluation

After a review of personal history, results from the psychological testing and a review of the records provided, and a discussion of the specific risk factors, Dr. Brenzinger opined that Christopher is a " Moderate-High Potential for sexually victimizing others in the community. (on a scale ranging from Low, Low-Moderate, Moderate-High, and High)" *Brezinger Psychosexual Risk Evaluation* page 12 attached)  It is also noted that Christopher was receptive to long term counselling in an effort to make better decisions in the future.

J.    In order to give the Court a more complete picture of Mr. Colon and is circumstance the following Christopher Colon statement is submitted:

**Early Life**

There are a few moments that compete for my first memory. One is my dad 's mom, Grandpa Shirley, giving me a bath in the kitchen sink. One is being in an apartment with my parents while they were visiting with a friend. The apartment was a basement apartment and I wandered away and found myself at the foot of the stairs that led to the upstairs part of the house. I could see light coming in from the bottom of the door at the top of the stairs. I was under 5 and I remember thinking the sliver of light was the moon and that 's where the staircase led to. My parents and their friend who they were visiting with were doing drugs at the glass coffee table.

I have an early memory of my dad sitting on the couch and crying. There must have been a storm that night because I remember the air smelled like a storm, full of static and electricity. I don't remember why he was crying but we were all sitting around him, my mom and my brother and I and it was alarming because even at such a young age my dad didn 't seem like the kind of person who cried.

The last early memory I have is a series of moments with my uncle. I would have been around 4 at the time. He's making me sit on his lap, holding me tight so I can't get away and thrusting against me. He is trying to force his penis into my mouth. Out of nowhere he's holding a pillow over my head and

pushing it down till I'm flailing and struggling for air. The most vivid moment is being on the bed with him over me, he was trying to penetrate me and I remember it hurt. I remember crying for my mother and then I remember looking out the window. The room was on the second floor and I looked into the leaves of trees. For a moment I focused so hard on the tree, the way the leaves were swaying, how the sun made the green color look so bright. I stopped feeling pain because all I was thinking about was that tree. That was the first time I learned to fade into myself when things were too hard or too scary.

Years later I'd be having sex with someone while I lived in Florida, I was having issues with anxiety at that time in my life, and as we had sex I stopped having an active interest and just let him do what he wanted. I turned my head to look out the window and saw a tree. I focused on the leaves and tears started falling from my eyes even though I don't remember feeling sad. I was in my early twenties.

Years after that when I was in my mid-thirties I was an inmate at Cook County Jail. I went to the dentist while I was there and she ended up pulling one of my teeth. I remember she was a nice and friendly black woman who wore her hair in a large seventy 's style afro and it looked lovely and dignified. As she worked on my tooth she was gentle and I turned my head a bit and let

my gaze rest on the window. I saw a tree. I hadn 't seen a tree and I couldn't remember how long at that point. Even when they let us outside there were walls all around us and you could only see the sky, punctuated by guard towers and razor wire. I looked at the tree and I started to cry. She asked if I was in pain. As best I could, with my mouth full of cotton and metal tools I tried to indicate that I was not in pain. I was though. Not in the way she thought, but I was.

Eventually my parents walked in on my uncle and me and then everything happened so fast. Suddenly I was in my mom 's arms. My uncle was cowering naked in a corner. My dad had pulled the cutlery drawer out of its socket and there was a clatter of all the utensils hitting the floor. My dad had a kitchen knife pointed at my uncle and my mom was crying and just trying to calm my dad down because on top of everything else I don't think she wanted my dad to murder anyone or for me to see anything like that. That 's where those memories stop.

At the time we were living with my dad 's family in Bensenville, Illinois. After that day we never went back to that house. From what I heard years later, my grandma Shirley begged my dad and mom not to go to the police because she was afraid of what would happen to her son in jail.They didn't go to the police and it wasn 't mentioned much again after that. Once my parents

were arguing and my mom called my dad 's family a bunch of child molesters. Once my brother was drunk and started saying why didn 't it happen to me instead?" I told him maybe it happened to me because I was strong enough to get through it. I was never really alone with my uncle again but he was around, family parties, birthdays, etc. No one talked about it and neither did I. Everyone knew but we didn 't address it in any way. I heard my aunt talking about it to a friend of hers once and saying how I needed to be told exactly what happened. It is odd having an open secret that isn't really secret because everyone knows about it. I felt like wearing a Halloween costume around a bunch of people that weren 't in costume, except my costume was really me and the way they looked like normal people was really costumes.I know that might sound confusing but I think you get me enough to know what I mean.

After that we moved around a lot, all over Chicago. Sometimes we moved in the middle of the night. Once we were evicted. Our apartments were always dirty. My parents worked all the time, sometimes two jobs. My brother and I weren 't tidy kids and the mess piled up. At first it would be toys and clothes taken from the boxes that hadn 't been unpacked yet. Add to that dishes and then fast food containers because it was easier to order a pizza than cooking a meal after a double shift. I remember always being happy when we

moved because there would be a few days of living in a clean house before it became a mess.

**Parents**

My dad worked, drank, and did drugs regularly while I was a kid. Unlike some addicts he didn 't vanish or hang out with friends, he stayed home. He would sometimes talk to me when he was drunk and tell my brother and I how important it was to be well dressed and have a nice haircut. Appearances were so important to him yet he lived in filth sometimes and it never occurred to me to see how he should be taking better care of us. When I was young I wanted my dad to be happy because when he was happy he was calm and would sometimes let me watch TV with him and I was a smart kid and was able to see the humor in adult shows so we laughed at the same stuff.

When he wasn 't happy that was the worst because it meant he would hit my mom. Never us, just her. I lived in constant fear of him hitting her. I still remember how she would scream in pain and it is something a kid really just shouldn 't ever hear. She would fight back. She would run away until he calmed down or went to sleep. By this time, I was about 8, we were in Catholic school and instead of God and love the school and nuns were constantly talking about the devil and sin and hell.

I remember one night my mom was late getting home and the later it got the drunker dad got and the angrier he got and it meant he was going to hit her when she got home. I went into my bedroom and begged God to please make it so he didn't hit her, but, she came home and he did and I went back into my room and told God I wouldn 't believe in him anymore.

It is odd to think that there were times before I was 8 where I sincerely wished and prayed for my dad to die, just so we would not be afraid anymore. He used to be a boy scout and would recite the oath for my brother and I and he took it very seriously. One night when it seemed like he was going to hit my mom I told him to promise he wouldn 't and he promised and to make sure I said "boy scout 's honor?" and he said "yes, boy scout 's honor". She came home and he hit her. That was when I learned in a fundamental way how there was nothing to believe in that would ever keep us safe. From the perspective of a child I made my dad a villain but he wasn 't. It is easy and natural for a kid to maybe see it that way but it was so much more complicated than that. He was not a villain, he was mostly sad and angry and had no way at all to cope with any aspect of his life.

My mother got high too. Nowhere near as much as my dad, but she did, and those days weren 't so bad because they 'd just hold themselves up in their bedroom all weekend and at least they weren 't fighting. She didn 't hit us or

make us feel scared. She loved us actually, but she stayed and I didn't understand why. She loved him, I get that, and they are still together and somehow managed to survive their early years together and I'm glad they are a sober and functional couple but I ask myself, was it worth it?

My mother was smart and pretty and a hard worker. People were getting divorced left and right, not her. She could have left him as she knew people in much less extreme circumstances and I remember her telling people to leave if they weren 't happy. At the end of the day I think she stayed partly because she loved my dad and partly because her family thought the marriage was a mistake. She got pregnant at seventeen with my brother. Her parents, who she didn 't have a great relationship with, were not on board so my dad 's mom was the one who helped them get married. I think leaving my dad might have meant her family had been right.

I remember a night when he had her backed against a wall and he had a butcher knife in his hand and stabbed it into the wall a few inches from her head. I guess if you don 't leave someone after that, you are probably just not going to leave. There were probably so many times my mom was close to becoming a statistic of extreme domestic violence. She is lucky nothing was ever fatal, that no guns were around and that she never got stabbed.

Sometimes, not often, she'd bring up to my dad what he had said and done the night before and he would say "No way. It didn 't happen that way" .

We all sort of gave him a pass because he was drunk and high but then I started to notice times when he was just as mean when he was sober and I knew it wasn't about drugs or alcohol anymore, it was just him and she stayed so in a way I was angry at both of them. The hardest part though, harder than the fear and uncertainty was how, even as a child you can be choked by your own grief over wanting to see your parents happy and yet being powerless to help them.

My father sustained a head injury that severely affected his short term memory but in other respects he remained the same, sometimes a bit more violent. We moved to South America (Colombia) with my mother's grandparents. My parents slowly gave up the drugs and alcohol and my father became less violent and he never hit my mother again.

I came out to my parents when I was 17, This caused friction with my father and I eventually moved to Florida. My parents relocated there some time later and we eventually started living together. My father came to accept my relationships with my boyfriend and eventually became a rather progressive parent for the late 90's.

I loved my father. It wasn 't easy but there were a few moments here and there where he would let his defenses down and laugh with me and imagine things with me and when he made us laugh he really made us laugh and as bad as things got I could never forget that night of the storm when he was crying and I wanted to know how to make him happy.

My mother was easy to love. We were buddies who were on the front lines together in the same war and we adored each other and made each other smile so that we could forget how bad things could be. It was hard though because I wanted so much for her to have a better life, an easier existence. It never seemed fair that this woman who from as young as I could remember did nothing but hold me and love me just as I was, she had to live a life with so much fear and pain and I wanted more than I ever wanted anything else to be able to make things OK for her, because she deserved better.

My mother suffered a nervous breakdown shortly after my incarceration. The realization that my behavior was the cause of this suffering is a heavy burden which I live with daily and causes me no end of shame and guilt. I hope that upon release I may take care of her for whatever time we have left in this world. Even a few weeks ago when she came to visit and she was confused and scared and sad, it was all there again, in her eyes. I saw every disappointment, every heartache, everything she had wanted to be better for

us, and just like when I was a kid I felt so sad that this is what happens and what we continue to go through.

My parents came from extremely unhealthy homes. They went on to raise me and my siblings in very unhealthy surroundings but they loved us and they got better. They struggled through my father's brain injury and stayed together. They got sober and while not perfect people they loved us and they learned to change and grow. I am very much a part of them and that legacy, the good and the bad, and despite all of my faults I am getting better and I am growing. My parents were trapped in a cycle they chose for themselves and we were their kids, along for the ride, loving them and fearing for them and hoping and praying with the innocence of youth that things would change.

## Siblings

My brother was the first to get out in a way.   The first few years of my life he and I played together and he sort of took care of me in his way. He built forts for us and he liked making me laugh. As he got old enough to be outside on his own and have his own friends he took off and stayed out as late as he could for every day he was allowed and I think he needed to do that because he was older and had a better understanding of how  bad our situation was. It was a house on fire and he ran. I lost him. I never thought of it as him leaving me,

it felt like losing him because that 's what it always felt like when someone I loved walked out the door, like I was losing something that I couldn't get back.

As a very young kid I remember being up early in the morning on weekends to watch Saturday morning cartoons with a bowl of cereal. My mom worked a lot of Saturdays and she would kiss me and tell me to be good and the door would close behind her and I would feel a sadness that seemed to come from the core of my little being and it was a sadness that seemed endless and accompanied by a feeling that I was never going to see her again.

After my brother began to take off I was either inside watching TV, sometimes playing outside with a gay kid who went to my school, but mainly I was with my cousin Monica at her house. I loved those times because I loved my cousin and we played Barbies from the time we woke up until bedtime. I also loved it there because their house was always clean and my aunt Maria was divorced so there was no potentially violent male figure around. I was at home less often and I was happier in a way but when I went home I would always wonder if she had been hit while I was gone.

Then my sister was born. They tried to keep the apartments where we lived more clean since there was a baby girl in the picture. They succeeded for a while but then things went back to the way they were. My great grandmother, my mom 's grandma, really adored my little sister so she would

take care of her a lot when my mom worked and my sister would end up sleeping there most nights out of the week. My mom would go to her house after work to see my sister and would end up spending the night sometimes too.

My great grandmother didn 't have any special affection for me. She had adored my mom since my mom was little and virtually ignored my mom 's siblings. She adored Monica because of Monica 's heart disease and ignored Vanessa, Monica 's sister and she pretty much ignored my brother and me. She sort of had a soft spot for my brother because he was my mom 's first kid, but me, not so much. Because she loved my mom and sister so much she was always around and always in our lives and aside from being glad there was a place we could go sometimes to hide from my dad, I was not her favorite and the feeling became mutual. I remember being very little and sitting on her lap and she was lovingly stroking my hands for no reason at all. She was in my life from the time I was born until I was twenty-three. She would look after me from time to time and she cared about me in that I was my mom 's kid and she loved my mom, but in over two decades of knowing her and being around her, that moment when she stroked my hands is the only time I remember her being loving to me.

In a way I think some adults in my life weren't quite sure how to interact with me after I was molested. In their minds maybe they were being extra careful with me but to me it felt like they thought there was something wrong with me. Sometimes I felt there was something wrong with me too.

**My Crime**

The first time I saw child pornography I was about twelve years old and an adult male showed it to me in an attempt to seduce me. He did not succeed but the experience left me with an unanticipated feeling of being drawn to that image. I didn't want to be drawn to that image. The fact that I was drawn to that image made me feel mentally ill, less than human, and incapable of ever having a normal life where I could love someone and have a home. These were heavy ideas to wrestle with at a young age and I did what I had always come most naturally; I compartmentalized it and put that part of me away. I ignored it and lived my life, finished school, got a job, went to college and got engaged to a wonderful man. As much as I was able to build a successful and stable life there was always a part of me that felt I did not deserve this or I would not be able to sustain it. It seemed because I was always drawn to the image of child pornography that mirrored my own abuse at the hands my uncle. I felt it was just a matter of time before things imploded. I'm Hispanic and grew up poor in

the not so great parts of Chicago and I saw where a lot of those people ended up and I thought I would too.

In 2015, I was convicted of possession of child pornography and placed on probation with mandatory counselling. I attended and completed the therapy which lasted about three years. In one way it was extremely helpful in providing me with a set of guidelines by which to measure my mental and emotional state. I came to learn how my stress factors can increase my risks levels and how to prevent myself from offending again.

Therapy was not helpful as it required mandatory group counselling with individuals who had committed violent acts of rape and individuals who continually made sexual advances, making the group setting less than a safe space.

Therapy did not cover certain other areas which would have far more applicable to my situation. I was not born a sex offender and whild I take full responsibility for my actions, those actions are still the product of years of abuse, loneliness, fear and sexual trauma alond with my very poor judgement. The doctor running these groups told me that I probably had PTSD since I was eight years old. Therapy made me realize I was chronically depressed on and off since I was ten years old. I got used to it and never asked for help. I accepted

it the way I accepted being raped and my father's violence I accepted with quiet resignation because there was nothing to be done.

In the last couple of years, I have lost everything. My parents moved back to South America. My sister moved to the West Coast. My partner left me. The simplest and truest thing would have been to tell my family, I still need them close by, that I was not ready to be alone. I did not say that because I never learned to express that to them and maybe if I had I would not be here today. Instead I made the awful choice of putting myself in the position of receiving an image of child pornography.

I regretted it immediately. I felt like a deeply damaged and sick human being and I desperately needed to change . I relocated to Oregon to be near my sister. I had spent so much of my life putting physical and emotional distance between and my family as I felt unlovable. I didn't want to feel like that anymore so I moved to Oregon to be near my sister. I tried to move closer to my family and their love for me instead of shying away from it. In a short time, I retained a post as a legal secretary when I was arrested and brought back to Illinois.

I have tried to use my time in prison responsibly. I have attended as many therapy sessions as I am allowed to. I have tried to read all of the literature I can find on survivors trauma and abuse, specifically, how they

process the trauma and successfully move forward in their lives. I assist inmates who only speak Spanish if they need help translating and I help inmates who struggle with literacy. I also maintain constant communications with my loved ones.

I am sorry for breaking the law. I have failed myself and those who loved me. I contributed to an industry that victimizes minors. I can only hope the full measure of who I am will be considered when I am sentenced. I failed in a terrible way but also I am a good person who has put a lot of good in the world and into the lives of others. I am deeply flawed as is every human being but when I consider my life and the horrible conditions that I came from, I think I can claim a small amount of success.

I have been employed full time almost continuously from the age of 17. I have had jobs that I have stayed at for years, being a credit to my employers and getting promoted within short periods of time after initial employment. I have volunteered with the Red Cross in Colombia during my early teens and as an adult I volunteered with PAWS Chicago where I provided care for animals as they awaited adoption. I have been a tax-paying, rent paying citizen. I have never physically harmed another person in my whole life.

Upon transfer to the BOP, I hope to attend college classes and seek mental health treatment to further cope with being raped at a young age and

its long term effects on my life, Upon release I will continue therapy with a professional who specializes with the victims of sexual abuse. I will work, I will maintain a residence and I will give back to the community in any way I am allowed to.

In summary, in the short time I have been in prison I have witnessed and experienced violence and sexual victimization. I have seen people struggle with deteriorating mental health and are without the tools to deal with it. There seems to be little value in remanding a human being to these circumstances. I believe the value comes in with the life you build if you are able to survive prison with your soul intact. I intend to do my best to survive during incarceration so that I can build a life outside of prison and rise above my mistakes and the circumstances I grew up in. I hope more than anything to be with my family again. The best of me is because of them, my capacity to love and do good is because of their enduring love for me. I humbly ask that you show leniency in imposing sentences so that I might return to those who love me and build a life that I can be proud of.

Thank you

Christopher Colon

## III. CONCLUSION

No matter what, 15 years is a very long time for anyone to serve in prison. There is simply no need or valid social purpose to warehouse Mr. Colon into his late 50s, especially in light of the already severe loss of his profession as a direct result of this arrest and conviction—not to mention again the extreme stigma of sex offender registration.  No doubt, these cases force terribly complex and vexing social and psychological issues into a criminal justice system not particularly well designed to gauge the historically fraught problem of sexual behavior.  Thus, the questions presenting a sentencing court passing judgment on the legality and morality of this type of aberrant conduct are equally vexing and challenging.  Nonetheless, it is the sincere hope of counsel that in this instance a sentence tempered with mercy will carry the day.

Respectfully submitted,

/s/ THOMAS C BRANDSTRADER
THOMAS C BRANDSTRADER,

CERTIFICATE OF SERVICE

THOMAS C BRANDSTRADER, Attorney at Law, hereby certifies that Defendant's Sentencing Memorandum was served on May 25, 2020, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.


*/s/ THOMAS C BRANDSTRADER*
THOMAS C BRANDSTRADER
PO Box 307
Highwood Il. 60040
8476504070
tcbdefense@gmail.com

COLON ATTACHMENTS TO SENTENCING MEMO

DOCTORS LETTERS POST SURGERU

SEXUAL OFFENDER EVALUATION



**Presence**℠
Saints Mary and Elizabeth Medical Center

**Roger Lichtenbaum, MD**
Section Chief, Neurosurgery
Assistant Professor of Neurosurgery, UIC

November 19, 2014

To: The Honorable Judge Vincent M. Gaughan:

I am a Board-Certified Neurosurgeon who has been treating Mr. Christopher Colon for a benign brain tumor and related seizure disorder, both of which were diagnosed in 2012. Mr. Colon underwent brain surgery in April 2012 to resect the tumor. He has done well since the surgery, without evidence of tumor recurrence on serial imaging. However, the patient's tumor was located in his temporal lobe, which is a highly epileptic portion of the brain. Even after resection of the tumor, he continues to suffer from seizures on a relatively regular basis. He continues to be under my care for treatment of this condition.

Historically, I have managed Mr. Colon's seizure disorder with antiepileptic medications. Due to the nature of Mr. Colon's volatile seizure activity and the associated therapeutic regimen, it is imperative that he receive close medical monitoring. This includes medication management that follows a very strict schedule, accessibility to serial bloodwork to regularly ensure that Mr. Colon's serum drug level is therapeutic, frequent office visits with Mr. Colon's neurology team and general practitioner, and availability of trained emergency medical professionals who can treat Mr. Colon during active seizures.

If Mr. Colon's seizure disorder is not managed with care, he could experience life-threatening brain injury and even death. With that said, I believe that incarcerating this patient could be highly detrimental to his health.

Please do not hesitate to contact my office with questions, or to further discuss this patient's treatment plan.

Sincerely,

Roger Lichtenbaum, MD

1431 North Western Avenue, Suite 306  Chicago, Illinois 60622          312.332.2226          presencehealth.org

Sponsored by the Franciscan Sisters of the Sacred Heart, the Servants of the Holy Heart of Mary, the Sisters of the Holy Family of Nazareth, the Sisters of Mercy of the Americas and the Sisters of the Resurrection



**Presence™**
Medical Group

December 3, 2014

Patient:     Christopher Colon
DOB:         07/21/80
MRN:         5137145

To: The Honorable Judge Vincent M. Gaughan

I am the Primary Care Physician for Christopher Colon. Mr. Colon developed a seizure disorder in April 2012. He was found to have a right temporal lobe tumor and subsequently underwent a Craniotomy and Tumor Debulking. He has been followed by Neurosurgery and me since 2012.

Christopher has periodic seizures. He is very sensitive to the precise timing and dosing of his medication, Keppra. I believe that he needs to be under close supervision at all times and that incarceration might jeopardize his medical condition. He needs dependable and accessible medical care at all times.

Should you have any questions and/or concerns please do not hesitate to call.

Best regards,

Kevin G. Murphy, MD
Presence Medical Group
Northside Family Medicine
2800 North Sheridan Road, Suite 606
Chicago, Illinois 60657-6156
773-525-8846
773-404-6280 (Fax)

2800 North Sheridan Road, Suite 606  Chicago, Illinois 60657          773.525.8846          presencehealth.org

Sponsored by the Franciscan Sisters of the Sacred Heart, the Servants of the Holy Heart of Mary,
the Sisters of the Holy Family of Nazareth, the Sisters of Mercy of the Americas and the Sisters of the Resurrection



# MIDWEST BEHAVIORAL RISK MANAGEMENT, P.C.

## PSYCHOSEXUAL RISK EVALUATION

### CONFIDENTIAL
### FOR THE PROFESSIONAL READER ONLY

**Name:** Christopher Brian Colon
**Age:** 39
**Date of Birth:** July 21, 1980
**Date of Evaluation:** December 17, 2019
**Date of Report:** February 28, 2020

**Diagnostic Procedures, Psychological Tests Administered, & Structured Professional Guide Used:**
- Shipley-2
- Personality Assessment Inventory
- Personal History Checklist for Adults
- Multiphasic Sex Inventory-Second Edition
- Substance Abuse Subtle Screening Inventory-Fourth Edition
- Stable – 2007
- Clinical Interview with Christopher Colon

**Records:**
1) Federal Bureau of Investigation, Ref: 188B-CG-C125349-C, 305A-CG-133168, 305A-LA-206282-P2P
2) University of Illinois Medical Center at Chicago, 2012
3) Rush Oak Park Hospital, 2012
4) Cook County Sheriff's Police Department, Case No.: 14-053957
5) Indictment, Case 14 CR 5808, Circuit Court of Cook County, 03/20/14
6) Written Correspondence Authored by Martha I. Colon, 05/30/14
7) Criminal History Report, Chicago Police Department, 10/02/14
8) Clear, Chicago Police Department, 10/02/14
9) LEADS, 10/02/14
10) Investigative Report, Adult Probation Department, Circuit Court of Cook County, 11/04/14
11) Eligibility Letter, Sex Offender Program, Adult Probation Department, Circuit Court of Cook County, 11/04/14
12) Presence Medical Group, 2014
13) Department of Homeland Security, Case No.: PT07QR18MK0009
14) Wisconsin Department of Justice, Case Master Report: 18-2167
15) ECD Technical Assistance Request, National Center for Missing and Exploited Children, 08/03/18

16) Application and Affidavit for a Search Warrant, Eastern Division, Northern District of Illinois, United States District Court, 04/10/18
17) Application and Affidavit for a Search Warrant, Eastern Division, Northern District of Illinois, United States District Court, 04/25/18
18) Federal Grand Jury Investigation, No.: 18 GJ 403, 08/21/18
19) Bench Warrant, Application and Affidavit for a Search Warrant, Eastern Division, Northern District of Illinois, United States District Court, 10/10/18
20) Written Correspondence Authored by Christopher Colon, June 2019
21) Plea Agreement, Eastern Division, Northern District of Illinois, United States District Court, 09/30/19
22) Written Correspondence Authored by Michael I. Alper, U.S. Probation Officer, 11/25/19
23) Agreed Order, Eastern Division, Northern District of Illinois, United States District Court, 12/13/19

**Referral Information:**
Mr. Christopher Colon voluntarily requested to participate in a psychosexual risk evaluation after being referred by his attorney, Thomas C. Brandstrader, J.D. Records indicated he was indicted for Receiving Child Pornography (2 Counts) and Accessing with the Intent to View Material Containing Child Pornography. On September 30, 2019, he pleaded guilty to One Count of Receiving Child Pornography (may be referred to as the index offense).

**Mental Status:**
Mr. Colon is a 39-year-old single Latino male, who was evaluated in one session at the Metropolitan Correctional Center (MCC) in Chicago, Illinois. The non-confidential nature and purpose for the evaluation was explained to him. Specifically, he understood and voluntarily signed the "Consent for Evaluation and Release of Information" form. One psychological test, the Multiphasic Sex Inventory, has its own informed consent form. He understood and signed the "Informed Consent for Psychosexual Testing" form. He had several questions about these forms and the evaluation process, and he agreed to participate given these limitations.

Mr. Colon was on time for his scheduled appointment and he was casually dressed and appropriately groomed. He was alert and oriented to person, place, time, and circumstance. He displayed no language impairment, either receptively or expressively, and spoke at a normal rate, tone, and volume. His thoughts were clear, coherent, and relevant to the subject at hand. His concentration and abstract reasoning ability appeared to be grossly intact. He maintained appropriate eye contact throughout the interview. His answers to questions were logical and appropriate. He displayed a wide range of affect consistent with the topics discussed.

Mr. Colon reported past passive suicidal ideation both during his adolescent years and again after his arrest for the index offenses. He denied any intent, plan or gesture. He denied any current self-harmful, suicidal, or homicidal ideations, intent, gesture, or plan.

Mr. Colon was capable of recalling and sharing personal information about himself. He approached the evaluation with a good attitude and appeared to put forth good effort.

**Background Information:**
In addition to the aforementioned records provided, Mr. Colon provided historical information about himself.

Mr. Colon said he was born in Chicago, Illinois and moved many times during his early childhood. Along with his mother and brother, he moved to Armenia, Columbia when he was 11-years-old and then to Miami, Florida at the age of 17. He was raised by his biological parents. He characterized his relationship with his mother as "good" and described her as warm and loving. He said he regularly witnessed his father physically and emotionally abuse his mother. He indicated both parents abused cocaine and his father abused alcohol. He reported that his mother disciplined him by lecturing, using corporal punishment and restricting privileges as a means to correct for undesired behaviors. He said his parents currently reside in Columbia, that they have visited him once since his detainment at MCC and that they have regular contact by phone and written correspondence. He has a younger sister and older brother and said he has a "good" relationship with them.

Mr. Colon reported he was physically abused by his mother one time and said his father would emotionally abuse him on a regular basis during his childhood. He reported he was sexually abused between the ages of four and eight. He said his 17-year-old uncle would force him to perform fellatio and would regularly suffocate him with a pillow. He said his uncle attempted to have penis to anus intercourse on occasion but does not believe this ever occurred. He reported this abuse occurred approximately twice a week over the course of four years. He said his parents walked-in during one occasion but that they decided not to disclose this abuse to local authorities. He reported while detained at the Cook County Department of Corrections in 2014, an inmate groped him sexually and threatened to physically assault him.

Medically, Mr. Colon reported that he was born full term and did not report that his mother was abusing alcohol or illicit substances during her pregnancy. He reported that he met developmental milestones. As a child he reported having surgery to his optic nerve and back. He has received treatment for Chlamydia. In 2012 he was diagnosed with a seizure disorder and had brain surgery to remove most of a tumor from his right temporal lobe. He said the surgery caused him some memory and cognitive problems. He reported last having had a seizure in 2018 and currently takes medication to manage this condition.

In 1999, Mr. Colon reported he sought out individual psychotherapy to address his depressed and anxious mood states. He attended one session and explained, "It was not a good fit for my treatment needs, so I never went back." He was briefly prescribed an antidepressant while detained at the Cook County Department of Corrections. He was arrested on 2014 and sought individual psychotherapy for approximately six or seven months with Dr. Karen Conner. He reported having participated in court ordered sex offender treatment at Adelante. He participated in approximately 24 months of counseling and said he successfully completed the sex offender treatment program. He was briefly prescribed an antidepressant medication at MCC to treat his depressed mood and anxious states, however discontinued

it after one month citing negative side-effects. He reported he recently earned a certificate of completion after attending the MCC Drug Abuse Program.

Substance Use History

| Substance | Age Began | Last Use | Peak Use | Current Use |
|---|---|---|---|---|
| Beer | ~ 15 | 2017 | No Peak Use<br>"I rarely drank beer." | None |
| Hard Liquor | ~15 | 2018 | Approximate Age: 28-30<br>"I would binge-drink 750 ml [~25 ounces] in one sitting about once a week." | None |
| Wine | ~ 15 | 2018 | Approximate Age: 31<br>"I would have about 2-3 glasses of wine [per sitting] 4 times a week." | None |
| Cannabis | ~ 15 or 16 | 2018 | No Peak Use Reported<br>"I would use it on rare occasion." | None |

Mr. Colon denied having ever experimented or used any illicit substances. He denied that his alcohol or cannabis has ever interfered with his academic coursework, social relationships or employment obligations to date.

Academically, Mr. Colon said he attended regular education classes and had no significant behaviors problems. He was in the 11th grade when he returned to the United States from Columbia. He said he earned his General Educational Development certificate in 1998 while living in Miami. He attended Miami-Dade Community College from 2000 to 2003 but dropped out after experiencing severe depression.

Professionally, Mr. Colon has worked as a receptionist, administrative assistant, in retail sales, was the manager of operations at the Hancock Tower Observatory, data entry, and was a quality control monitor.

Interpersonally, Mr. Colon denied that he has ever been in a criminal organization (e.g., street gang). He reported that he has casual acquaintances and close friends and enjoyed going out to eat and volunteering at a local animal shelter. He is currently single, not dating and has no children.

Mr. Colon denied having any juvenile criminal history. As an adult, records indicated he was charged with 20 Counts of Aggravated Child Pornography/Possess Film and 22 Counts of Child Porn/Possess Film. On January 15, 2015 he pleaded guilty to Aggravated Child Pornography in the Circuit Court of Cook County, Illinois. He was sentenced to 91 days in jail and three years of sex offender probation, mandated to successfully complete a sex offender treatment program and his case was satisfactorily terminated in January 2018.

In June 2017 an undercover law enforcement agent replied to a Craigslist post. Mr. Colon posted "Hey there, Very into taboo/perv chat. Looking to chat and possibly meet up with guys that are into similar. Into yng, fam/incest, Mb Looking to chat and share stories." They communicated with each other,

discussed meeting at Mr. Colon's place of employment to possibly engage in sex with the undercover agent's minor children.

In December 2017 law enforcement officials arrested R.F. [adult male] for child exploitation. During this investigation, authorities identified electronic communications between R.F. and Mr. Colon. R.F. sent Mr. Colon five images of child pornography.

In December 2017 an undercover law enforcement agent replied to another Craigslist post. Mr. Colon posted, "Hey there, Very into taboo/perv play. Looking to meet up with guys that are into similar. Always fantasized about messing around with a guy while his son or nephew is in the next room. Leave the door open so ur son or neph can peek in and see you sucking my cock." He indicated he was interested in children aged 0-12, preferring boys.

Mr. Colon placed a profile on a website entitled "Sittercity.com," an online resource for individuals seeking childcare. He posted his profile in 2013 and again in 2017. In 2018, he applied to be an on-call guest services attendant at Ronald McDonald House.

Records indicated he was indicted for Receiving Child Pornography (2 Counts) and Accessing with the Intent to View Material Containing Child Pornography. On September 30, 2019, he pleaded guilty to One Count of Receiving Child Pornography.

**Test Results:**
Shipley-2
On a test designed to assess cognitive functioning and impairment, Mr. Colon scored in the Average range when compared with his peer group. This test instrument has two tasks. One measures his crystallized knowledge, which is gained through education and experience, and he scored in the Above Average range. While the second measures his fluid reasoning, which is his capacity to use logic to learn and acquire new information or solve problems, and he scored in the Average range. There is no indication that he suffers from a major cognitive impairment.

Personality Assessment Inventory
Mr. Colon produced a valid profile on a test that assesses psychopathology. He reported experiencing significant trauma related to his being sexually victimized which continues to negatively affect him to date. He indicated experiencing a moderate degree of stress as it relates to his legal stressors. He indicated having some difficulty asserting himself in social situations. He acknowledged having major life difficulties at this time and was aware of his acute need for help in dealing with these problems.

Substance Abuse Subtle Screening Inventory-Fourth Edition
On a test developed to determine the presence of substance dependence, Mr. Colon's scores suggest that there is a High Probability (measured on a scale of either High or Low Probability) that he has a substance use disorder.

Multiphasic Sex Inventory-Second Edition (MSI-II)
The MSI-II is designed to measure the sexual characteristics of an adult male alleged to have committed a sexual offense or sexual misconduct and can be used to conduct a sexual deviance evaluation and also to measure treatment progress. The following interpretation was provided by the test developer.

Test Taking Attitudes and Behaviors: The MSI-II is designed to identify a client's attempt to exaggerate or to deny psychopathology. The MSI-II incorporates multiple measures that can test for a client's carelessness, malingering, inconsistency, evasiveness, defensiveness and deception:

1. Reliability Estimates:
    a. Inconsistency Responses (tests for carelessness and/or inattention) he scored in the acceptable range.
    b. Repeated Items Scale (tests for reliability) he scored in the acceptable range.
    c. Parallel Items Scale (tests for reliability) he scored in the acceptable range.
    d. Infrequency Scale (tests for a malingering response set) he scored in the acceptable range.

2. Validity Indicators:
    a. Net Omits Index (tests for evasiveness) he did not omit essential test items.
    b. Total False Percent Scale (tests for malingering and deceptive test taking behavior) he scored in the acceptable range.
    c. Fake Good Scale (tests for guarded/defensive response set) he scored in the valid, acceptable range.
    d. Dissimulation Scale (tests for guarded/defensive behavior) he scored in the valid, acceptable range.
    e. Sexual Denier Scale – (tests for a client's defensiveness about his own interests in sex) he scored in the valid, acceptable range.

He reported being in good health and indicated he takes prescription medication daily. He reported having been severely physically abused as a child and was molested and raped over a period of years. He indicated he was a loner while growing up.

A general sexual (non-criminal) assessment was undertaken and his findings suggested he had a below average knowledge of sexual anatomy and physiology. There was no indication that he suffered from any form of a sexual dysfunction and/or desire disorder. He appeared to be satisfied with his physical features and general appearance. He reported he has had sex with both males and females. He acknowledged having a typical interest in normal adult erotica. He reported having had sexual arousal to behaviors involving bondage and discipline (e.g., whipping and spanking). He responded "true" to the item which referred to having choked someone or put something over their nose and mouth during sex. Regarding any sexual obsessions or addictions, it was found that he had an addiction to pornography but did not report having a current preoccupation with sex.

With respect to Sexual Deviance, he admitted to committing a sexual offense. His responses to interests and behaviors involving deviant pornography suggested he had sexual arousal to rape pornography. He

seriously minimized having deviant sexual desires or having been sexually aroused by fantasies involving sex play with a child; he reported having looked at pictures of children to stimulate himself sexually; he disclosed having sought, obtained, traded and used deviant pornography for sexual purposes (e.g., masturbation); and he indicated having had an addiction to pornography.

On the Scheming Scale his scores suggested he did not acknowledge the planning strategies he used to "set up" his offense behavior. On the Superoptimism Scale his scores suggested he minimized any feelings of anticipation and excitement leading up to acting out his offense behavior.

The Molester Comparison Scale is an empirically scaled measure using demographically comparable, but distinctly different samples involving admitting adult male sex offenders who manipulate, rather than force their victims (criterion group sample) and normal adult males (control group sample). This scale is equally applicable to both offender and non-offender populations as it contains no personal history or deviant sexual content items. This allows the scale item pool to be imperceptible and generic for all persons including admitting adult male sex offenders and adult male "normal" responders alike. This further provides a standard measurement unit in which a sex offender may score as low as normals or higher like the sex offender sample. His score was compared to both the criterion related and normal control samples and his results suggested he scored in the Low Average range suggesting that the level of commonality in thinking and behavior between him and the reference group of adult male sex offenders is Moderately Similar.

The Rapist Comparison Scale is an empirically based measure using demographically comparable but distinctly different samples of admitting adult male sex offenders who primarily use force during a sexual assault. This scale is constructed with both dynamic and static items and the item pool is essentially non-transparent and contains a few sexually deviant items. The level of commonality in thinking and behaving between him and the reference sample is Not Similar

It is generally recognized that most sex offenders have developed a way to make their sexual misconduct or sex offense behavior acceptable to themselves thereby relieving themselves of responsibility for engaging in inappropriate or illegal sexual behaviors. The Sexual Rationalization measure assesses different types of rationales used to avoid taking personal accountability for some level of sexual impropriety, misconduct or offense behaviors. He reported he has always known it was wrong to engage in sexual activity with an underage person or to force someone to engage in a sex act. His responses on the Denial and Justifications scales were not significant suggesting that for the most part he took responsibility for his offense behaviors.

Research with the MSI-II emotion scales are consistent with the findings of fMRI brain scan research in neuropsychology which relates to the relationship between emotion and behavior. Using the MSI-II scales which assess emotion it was found that he did not elevate on any of the scales. This finding suggested that at this time he appeared to have coping strategies that allow him to adapt and regulate his emotions and feelings to negative social occurrences. Currently he did not present as depressed or to have suicidal thoughts.

In sum, his results suggested he is capable of showing effort in treatment. He was generally found to be disclosing on testing which should carry over into treatment. He reported having committed a sexual offense and acknowledged engaging in deviant sexual behavior. He did not attempt to justify his behavior. He reported he was ashamed of what he did and is sorry for the victim. He indicated he needs help because he is not able to control his sexual behaviors. His test results suggest he may potentially be a suitable treatment candidate.

**Sexual History Background:**
Mr. Colon reported he first learned about sex when he was sexually abused between the ages of four and eight. He said his parents maintained conservative sexual boundaries in the home.

Mr. Colon identified himself as homosexual. He said he began to masturbate when he was approximately 8-years-old. Currently he masturbates daily and fantasizes about adult males.

Mr. Colon reported having five serious romantic relationships to date, all of which became sexual. He defined a serious relationship as, "We are committed, exclusive and in love." His longest relationship lasted four years. He reported having approximately 60 casual dating relationships, all of which became sexual. I define sexual behavior, including but not limited to, mutual fondling over clothing or under clothing, fellatio, cunnilingus, digital penetration, and penis to vagina / anus contact or intercourse. He last had sex approximately two years ago.

Mr. Colon reported he is sexually aroused and/or attracted to:
- Male and Female Children: Age 12 and under
- Male and Female Adolescents: Age 13-16
- Male and Female Adults: Age 18 +

Mr. Colon reported engaging in the following sexual activities:
- Bondage / Sadomasochism: He explained having engaged in "light" bondage and discipline with consenting adult partners.
- Group Sex: He reported having had sex with two consenting adult males on two different occasions.
- Cybersex: He reported having had sexually themed discussions with and sent pictures of his genitals to his consenting sexual partners.
- Having Sex in a Public Location: He reported having had sex with consenting adult partners in a vehicle and inside a dance club, but there was as no intent nor were they seen by others.
- Using Inanimate Sexual Devices: He reported having used a sexual toy with consenting adult partners.
- Adult Entertainment Establishments: He reported having patronized a strip-club twice while socializing with his peers.

Mr. Colon reported he has been viewing adult commercial pornography, almost daily, since he was 14-years-old. He was introduced to child pornography from a sexual partner when he was 19-years-old. He

discontinued viewing child pornography after this relationship ended. Since 2009 until his arrest for the index offense, he said he viewed child pornography once a week as an aid to masturbation.

Mr. Colon denied having any interest in or having engaged in any of the following behaviors: voyeurism, stalking, frottage, fetishism, bestiality, necrophilia, urolagnia, coprophilia, or making obscene phone calls or writing obscene letters to strangers.

Mr. Colon was asked when he believes a person is old enough to have sex. He stated, "18, because they are of legal age and emotionally and mentally capable of making that decision." When asked what he thought of children (age 12 and under) having sex he stated, "It is an assault, kids cannot consent to have sex." When asked what he thought of adolescents (age 13-16) having sex he stated, "I know kids this age will have sex with each other, but they should not have sex with adults at this age." He was asked his thoughts of adolescents or adults having sex with children (age 12 and under) or adults having sex with adolescents (age 13-16) he stated, "That is bad, it is abuse." When asked what he thought of forcing someone to have sex against their will he stated, "That is terrible, it is rape."

To his credit, Mr. Colon was able to identify four important elements to consider when obtaining sexual consent from a potential sexual partner, that being their age, their ability to provide voluntary consent, them not suffering from a developmental disability or being intoxicated.

Mr. Colon was asked to explain his version of the index offense. He explained, "I used bad judgment, my parents moved to South America, my sister moved to Oregon, and I felt adrift. I should have asked for help. I was still emotionally raw and fell back on unhealthy habits. I was drinking alcohol, but not that much and I was hooking-up more with random people. I was trying to fill a sense of loneliness when I met [R.F.]. We did chat back and forth, talked about child pornography and then met twice in Skokie and watched child pornography, masturbated together and had oral sex."

Mr. Colon was asked to explain his discussions with the undercover agent. He said, "That was role play chats. We talked a lot back and forth, and I know we were setting-up a meeting, but I chose not to meet. It became too real and I was not going to abuse a child."

Mr. Colon was asked to explain his interest in gaining access to children via the "Sittercity.com" and Ronald McDonald House. He said, "I was living out a fantasy, teetering much closer to the edge than I should have. I created the profile on Sittercity.com and lied about my credentials. My phone actually rang twice, two people wanted to hire me, but I never called them back." When asked why he did not return these calls he explained, "When I saw child porn, I would superimpose my face on the child and my uncle's face on the adult abusing the child. That would lead me to be aroused, but the images and videos became too vivid and I could no longer superimpose our faces, I lost the enjoyment then and was horrified and shameful for what I had done…I thought I was dead inside." He repeatedly and vehemently denied having ever sexually abused anyone.

**Assessment of Risk Factors:**
According to Fernandez, Harris, Hanson and Sparks (2012), "Research shows that structured risk prediction instruments consistently outperform clinical judgment in their ability to estimate who will and will not commit another sexual offence" (p. 6).

The Stable-2007 was developed to assess change in intermediate-term risk status, assessment needs, and help predict recidivism in sexual offenders. Hanson and Harris (2004, 2007) developed this risk assessment instrument based on a large prospective study from Canada, as well as the states of Alaska and Iowa with a total sample size of 997 sexual offenders.

The Stable-2007 consists of 13 items and produces estimates of stable dynamic risk based upon the number of stable dynamic risk factors present in any one individual. The risk factors included are the presence or absence of significant social influences, capacity for relationship stability, emotional identification with children, hostility toward women, general social rejection, lack of concern for others, impulsivity, poor problem solving skills, negative emotionality, sex drive and preoccupation, sex as coping, deviant sexual preference, and cooperation with supervision.

The authors of the Revised Stable-2007 Coding Manual (Fernandez et al, 2012) wrote, "Like Static-99, the Stable-2007 has only been validated on adult male sexual offenders who have had at least one identifiable victim (Category "A" offences; see Harris et al., 2003). Nevertheless, some evaluators may wish to use Stable-2007 for offenders outside the sampling frame of Static-99, such as female sexual offenders or men whose only sexual convictions involve possession of child pornography. With these populations, Stable-2007 should only be used as a clinical guide to identifying treatment needs and supervision targets. It should not be used to estimate recidivism rates or to assign nominal risk categories (e.g., low / moderate / high risk). Furthermore, we recommend that evaluators explicitly state that Stable-2007 has not been validated for the offender at-hand if the offender is not an adult male with a Category "A" sexual offence somewhere on his record. Female sexual offenders and child pornography offenders were included in the sampling frame of the Stable-2007 development study (Hanson et al., 2007). However, there were too few of these offenders to make meaningful conclusions" (p. 20).

Mr. Colon's current circumstances do not allow for the use of the Static-99 (or Static-99R, the most current version), and therefore does not allow reporting of his Stable-2007 Total Score, which provides statistical recidivism rates.

The following *treatment needs* and *supervision targets* were identified for Mr. Colon:

Significant Concerns:
- Sex Drive / Sex Preoccupation, which is operationally defined, in part, as there is evidence of sexual pre-occupation or elevated sex drive (e.g., For Mr. Colon, sex-oriented internet use: viewed adult and child pornography, masturbation, online role-play chats, and multiple sexual partners).

- <u>Sex as Coping</u> is operationally defined, in part, as negative emotions or life events that typically invoke sexual thoughts or behaviors. (e.g., For Mr. Colon, he reported that life stress, negative emotions and feeling isolated from others trigger sexual thoughts and behaviors).

- <u>Deviant Sexual Interests,</u> is operationally defined, in part, by the number of sexual offense victims and deviant sexual preference (e.g., For Mr. Colon, his self-reported sexually deviant interests and behaviors).

Some Concern:
- <u>Capacity for Relationship Stability,</u> is operationally defined, in part, by asking a two-part question: A) Has the individual ever lived with an intimate partner for two continuous years? And B) Does the individual have a current lover or intimate partner now and what is the stability of this current relationship (e.g., For Mr. Colon, he has had a prior live-in intimate partner but is not currently in a dating/romantic relationship).

- <u>Poor Problem Solving Skills,</u> is operationally defined, in part, as having a history of poorly considered decisions but is willing to make changes (e.g., For Mr. Colon, he relapsed after successfully completing sex offender treatment).

- <u>Cooperation With Supervision:</u> is operationally defined, in part, as having previously breached the conditions of probation (e.g., For Mr. Colon, he violated the terms of his probation).

**Individual Specific Risk Factors and General Discussion:**
Concerns were noted with respect to his reported early childhood development. For example, he reported he was chronically sexually abused by his adult uncle from the age of four to eight. At the age of 13, he began viewing adult commercial pornography and masturbated almost daily. He was raised by two drug-addicted parents, having moved many times, including to Columbia during his formative years. It is certainly noteworthy to further examine his reported early childhood development, experiences, and family system in a therapeutic setting. These experiences may have significantly and negatively influenced his sexual development during an impressionable time during his childhood.

It is important to note that the following behaviors are not interpreted as being sexually deviant (e.g., non-consensual) including bondage / sadomasochism, group sex, cybersex, using inanimate sexual devices and patronizing adult entertainment establishments.

Mr. Colon reported that he regularly viewed adult commercial since early adolescence and was introduced to child pornography in 1999 and began regular use since 2009. Concerns are noted in that despite successfully completing a sex offender treatment program, he chose to relapse. To his credit, he is receptive to going through another sex offender treatment program to learn more about his behaviors and to create new interventions and apply new skills in an effort to make better decisions in the future.

**Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition (DSM-5, 2013):**
- 302.2  Pedophilic Disorder, Nonexclusive Type, Sexually Attracted to Males

- 302.89  Other Specified Paraphilic Disorder (Deviant Pornography)
- 303.90  Alcohol Use Disorder, In Early Remission
- 311      Unspecified Depressive Disorder

<u>Other Conditions That May Be a Focus of Clinical Attention</u>
- V62.5   Problems related to interaction with the legal system

**Conclusions and Recommendations:**

Given Mr. Colon's reported personal history, results from his psychological testing, the Stable-2007, and a review of the records provided, it is my opinion to a reasonable degree of psychological certainty, that he is, at this time a <u>Moderate-High Risk Potential</u> for sexually victimizing others in the community (on a scale ranging from Low, Low-Moderate, Moderate-High, and High).

<u>Mr. Colon may benefit from the following:</u>

1. He would benefit from participating in another sex offender treatment program to address his sexual deviance. Ideally, he would benefit from seeing someone who is a Licensed Sex Offender Treatment Provider in Illinois. He should participate in a cognitive-behavioral treatment style primarily involving him to actively participate and dialog with the group, rather than exclusively receive written materials. His future therapist should receive a copy of this psychosexual risk evaluation to assist them in developing an individualized treatment plan. He should successfully complete this program.

   <u>Group psychotherapy treatment targets to consider include:</u>
   - Regular monitoring and assessing for any self-harmful or suicidal ideation, intent, plan, or gestures.
   - Address his early childhood development.
   - Increase his awareness of and reduce any use of cognitive distortions.
   - Address his past alcohol use and how it may have affected his behaviors.
   - Address his use of adult and child pornography as a masturbatory aid.
   - Address his deviant and non-deviant sexual behaviors.
   - Address his MSI-II results.
   - Address his Stable-2007 treatment needs and supervision targets.
   - Further develop his understanding and empathic response of how sexual abuse can negatively affect those victimized.
   - Identify practical arousal control techniques.
   - Develop a comprehensive and pragmatic deviant sexual offense cycle with corresponding interventions.
   - Develop a comprehensive and practical relapse and crisis prevention plan with corresponding interventions.

He may be asked to participate in a polygraph examination as part of this treatment plan. His future therapist can determine if or when he would benefit from taking a polygraph examination.

2. At this time, he should be prohibited from being around any minors without direct supervision from an approved chaperone/supervisor.

3. At this time, he should be restricted in his use of <u>personal electronic devices</u> that can transmit images or have access to the internet. If or when he does regain his personal electronic devices, he would likely benefit from installing state of the art software filters to monitor and screen out specific high-risk areas/content on the internet.

4. He would benefit from <u>concurrent</u> individual psychotherapy. His future therapist should receive a copy of this psychosexual risk evaluation to assist them in creating an individualized treatment plan.

   <u>Individual psychotherapy treatment targets to consider include:</u>
   - Regular monitoring and assessing for any self-harmful or suicidal ideation, intent, plan, or gestures.
   - Address his early childhood development, including sexual victimization.
   - Educate him on the nature and course of his mental disorders so he can better manage his signs and symptoms in an adaptive manner.
   - Address and manage his feelings of isolation.
   - Address his past alcohol use and continue to encourage him to live a sober lifestyle.
   - Assist him to better recognize and adaptively manage perceived stressors.
   - Periodic assessment of his interpersonal and familial relationships.
   - General supportive counseling.

5. He may consider participating in a psychiatric evaluation and collaboratively discuss any treatment recommendations. Any future psychiatrist should receive a copy of this psychosexual risk evaluation to help provide historical information to consider before the assessment and/or to help create any treatment plan.

6. It is recommended that his risk potential for sexually victimizing others in the community be re-evaluated at least every 6 to 12 months or whenever there is an important change in the status of his case or life circumstance. It is important to note that the risk and intervention recommendations are dynamic in nature, and as a result can fluctuate in either risk direction (e.g., lower or higher). Consequently, re-evaluation at regular intervals or as a case situation warrants, is consistent with a best practice approach (Webster, et al, 1997).

Additionally, Fernandez, et al (2012) wrote, "It is prudent to do risk assessments each year as there is evidence to suggest (Hanson et al., 2007) that repeated assessments of dynamic factors improve predictive accuracy for sexual offenders. There is also some evidence to suggest that Stable [2007] scores may be able to detect changes in risk status when measured before and after

sex offender specific treatment programs (Nunes, Babchishin, & Cortoni, 2011)" (p. 26).

Respectfully Submitted,

*[signature]*

Mark Brenzinger, Psy.D.
Licensed Clinical Psychologist - IL License 071-007267
Licensed Sex Offender Evaluator - IL License 271-000086
Licensed Sex Offender Treatment Provider - IL License 272-000074

**References**

Fernandez, Y., Harris, A., Hanson, R. Sparks, J., (September 27, 2012). Stable-2007 Coding Manual, Revised 2012.

Hanson, R. K., & Harris, A. J. R. (2004). STABLE-2000/ACUTE-2000 : Scoring manuals for the Dynamic Supervision Project. Unpublished scoring manuals. Corrections Research, Public Safety Canada, 340 Laurier Ave., West, Ottawa, Ontario, Canada, K1A 0P8.

Hanson, R. K., Harris, A. J. R., Scott, T.-L., & Helmus, L. (2007). Assessing the risk of sexual offenders on community supervision: The Dynamic Supervision Project. User Report, Corrections Research, Ottawa: Public Safety Canada. Available at www.ps-sp.gc.ca/res/cor/rep

Harris, A., Phenix, A., Hanson, R. K., & Thornton, D. (2003). Static-99 Coding Rules Revised-2003. Available http://ww2.ps-sp.gc.ca/publications/corrections/pdf/Static-99-coding-Rules_e.pdf

Nunes, K. L., Babchishin, K. M., & Cortoni, F. (2011). Measuring treatment change in sexual offenders: Clinical and statistical significance. Criminal Justice and Behavior, 38, 157-173.

Webster, C., Douglas, K., Eaves, D., and Hart, S. (1997). HCR-20 Assessing Risk for Violence, Version 2. Mental Health, Law, and Policy Institute, Simon Fraser University, Burnaby, British Columbia, Canada.